FILED
United States Court of Appeals
Tenth Circuit

November 13, 2024

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

PHT HOLDING I, LLC, on behalf of itself
and all others similarly situated,

     Plaintiff - Appellant,

v.

SECURITY LIFE OF DENVER
INSURANCE COMPANY,

     Defendant - Appellee.

No. 23-1326
(D.C. No. 1:18-CV-01897-DDD-SKC)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **TYMKOVICH**, **MATHESON**, and **McHUGH**, Circuit Judges.

_____

PHT Holding I, LLC owns five universal life insurance policies issued by

Security Life of Denver Insurance Company.  In 2015, Security Life increased each

policy's "cost of insurance rate," which it uses to calculate a monthly deduction from

policyholders' accounts.  In district court, PHT's predecessor claimed that Security

Life breached the policy contract on three grounds.  The court granted summary

judgment to Security Life on two of them, the parties settled on the third, and PHT

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

appeals the summary judgment on only one of two remaining grounds. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual History*

### 1. Relevant Policy Provisions

Universal life insurance provides a death benefit and also includes a savings component. Each month, policyholders pay a premium into an account managed by Security Life. Policyholders earn a guaranteed minimum rate of interest, and they may make partial withdrawals from the account without terminating their death benefit coverage. Policyholders may also choose to cash out entirely and thereby terminate any further coverage. In exchange, Security Life takes 10 percent of every premium deposit and deducts other monthly fees. One monthly deduction is the "cost of insurance," which helps Security Life fund the payout of death benefits.

#### a. *Cost of insurance provision*

The policies in this case are materially identical. Each allows Security Life to make a monthly cost of insurance deduction. Each contains a "COST OF INSURANCE" provision, which appears in the "DEDUCTIONS" section of the contract. App., Vol. I at 106-07. This provision explains that the cost of insurance "is the cost of insurance rate . . . multiplied by the net amount at risk." *Id.* at 107. The net amount at risk varies based on the policy's base death benefit, guaranteed minimum interest rate, and account value. *Id.*

The cost of insurance provision permits Security Life to recalculate the cost of insurance rate ("COI rate"), which is used to calculate the monthly cost of insurance deduction. The provision provides that "[t]he cost of insurance rate for each segment will be determined by [Security Life] from time to time." *Id.* It specifies that in "applying its current rates for each insured," Security Life will "refer to" certain mortality factors, namely the "gender and age of the insured as of the effective date of segment coverage, the duration since the coverage began, the amount of target death benefit and the segment premium class." *Id.* In addition, Security Life must apply any change in the COI rate "to all individuals of the same premium class and whose policies have been in effect for the same length of time." *Id.* Finally, the provision promises that the COI rates "will never exceed" certain maximum rates set out in an appended "Table of Guaranteed Rates." *Id.*

b. *Nonparticipating provisions*

Each contract contains two "nonparticipating" provisions. The cover page states that "[t]his policy is nonparticipating and is not eligible for dividends." *Id.* at 88. A provision titled "NONPARTICIPATING" appears within the "GENERAL POLICY PROVISIONS" section of the contract. *Id.* at 113. A single sentence beneath that heading states that "[t]his policy does not participate in [Security Life's] surplus earnings." *Id.*

2. **The 2015 Cost of Insurance Rate Increase**

When Security Life initially priced the policies, the company assumed its own insurers—its reinsurers—would reimburse 90 percent of the death benefits payable

3

under the policies.  But reinsurance premiums later increased.  In 2011 and 2014, Security Life's parent company, Voya, cancelled some of its reinsurance contracts.  Security Life thereby "recaptured" liabilities it had previously ceded to its reinsurers, resulting in a loss on its balance sheet.  Also, beginning in 2012, Voya directed Security Life to consider adjustments to the non-guaranteed elements of its universal life insurance products such as the COI rate.

In March 2015, a Security Life working group proposed raising the COI rate applicable to several groups of policies, including the Life Design Guaranteed Universal Life ("LDGUL") and Strategic Accumulator Universal Life ("SAUL") product lines.  In calculating the proposed rates, the working group accounted for Security Life's recapture of liabilities from its reinsurers.

Two executives from the working group summarized the proposal in a memorandum to Security Life's board of directors (the "Board Memo").  It discussed 29 product lines and recommended rate increases for 14 of them.  It explained that the proposed increases to COI rates complied with the company's internal redetermination policy, which "states that any redetermination of [non-guaranteed elements] shall be to maintain the present value of future profits, and that there should be no attempt to recoup past losses."  Aplee. Br. at 12 (quoting the Board Memo).

The Board Memo also contained a "Policy Review" section explaining that "[e]ach policy form contains . . . a provision that explains to policyholders what the cost of insurance charge is, when an adjustment may be made and what factors may

4

be considered in evaluating any adjustment." App., Vol. II at 489. The working group "considered *only* those factors permitted by the policy forms" in determining the new COI rates. *Id.* The group was "also mindful" of the nonparticipating provision of the policies, which "states that the policyholder is not entitled to share in the profits of the Company, and the Company may not attempt to recoup past losses from the policyholder." *Id.* The Board Memo noted that the nonparticipating provision was "consistent with" the company's internal redetermination policy. *Id.*

Security Life approved a 9.25 percent increase in the COI rate applicable to the LDGUL policies and a 42.3 percent increase in the COI rate applicable to the SAUL policies, effective October 2015.

### B. *Procedural History*

### 1. Initial Proceedings

In 2018, Advance Trust & Life Escrow Services, LTA—which owned three LDGUL and two SAUL policies—filed a putative class-action complaint against Security Life.[1] The complaint claimed breach of contract, alleging that Security Life "did not base COI rates on its actual projected costs of insurance and increased COI rates based on factors other than the cost of insurance." App., Vol. I at 52.

Advance Trust developed its theories of breach during discovery. In a class certification motion, it argued that Security Life breached (1) the cost of insurance

---

[1] Security Life issued the polices at issue in this appeal to individuals, who later sold them to corporate entities.

5

provision by relying on impermissible factors in setting the new COI rates, (2) the nonparticipating provisions by increasing COI rates to recoup past losses, and (3) the cost of insurance provision by raising COI rates on a non-uniform basis across SAUL policies. Security Life moved for summary judgment on all three theories.

2. **Summary Judgment**

The district court granted summary judgment to Security Life on the first two theories and denied it on the third.

   a. *Cost of insurance provision*

The district court held that Security Life "did not breach the cost-of-insurance provision when it considered non-mortality factors as part of its decision to raise rates in 2015." App., Vol. I at 215. The court said the question was "whether Security Life had the authority to raise cost-of-insurance charges, and if so, what bounds the contracts put on that authority." *Id.* at 218. It explained that the cost of insurance provision "only contains the following commands": (1) Security Life will determine the COI rate "from time to time," (2) any change in the rates will be uniform across premium classes, (3) the rates will never exceed certain guaranteed maximums, and (4) the company will "refer to" certain mortality factors in setting rates. *Id.* at 216.

Advance Trust had argued that Security Life could consider only the mortality factors listed in the provision. The court disagreed, concluding the provision gives Security Life "substantial discretion" to set COI rates so long as the company "d[oes]

6

in fact refer to mortality factors along with other considerations," which it did here. *Id.* at 219-20.

The district court also rejected Advance Trust's argument that this interpretation gave Security Life "unfettered discretion" to set COI rates. *Id.* at 219. The court explained that (1) the provision puts a "hard cap" on maximum COI rates and (2) "this is not a case in which the insurer is alleged to have used the rate increases for purposes wholly unrelated to the provision of insurance." *Id.* It concluded that even assuming the phrase "cost of insurance" is ambiguous and cabins Security Life's "rate-setting discretion," the "alleged actions here fall within that interpretation of the policy." *Id.*[2]

b. *Nonparticipating provisions*

The district court held that Security Life did not breach the nonparticipating provisions. It noted the contract uses "nonparticipating" "to mean that the policies don't share in Security Life's 'surplus earnings.'" *Id.* at 220. Although the contract does not define "surplus earnings," the court said the plain meaning of "surplus" is "an amount in excess," and the plain meaning of "earnings" is "recompense, reward, esp. for service; gain, profit." *Id.* (quoting *Oxford English Dictionary* (3d ed. 2009)). Thus, "surplus earnings" means "profits or dividends," a reading consistent with

---

[2] As discussed below, the court separately addressed Advance Trust's argument that Security Life violated the cost of insurance provision's uniformity requirement by raising COI rates on some SAUL policies but not others. The parties later settled this claim, and no SAUL policies are at issue in this appeal.

insurance dictionaries and treatises, and consistent with the understanding that participating policies pay dividends and nonparticipating policies do not. *Id* at 220-21. "Under this plain reading of the policies, the non-participation provision bars participation in profits only; the polices do not bar Security Life from raising cost-of-insurance rates to recoup past losses." *Id.* at 221.

The district court rejected Advance Trust's counterarguments. It disagreed that "nonparticipating" is ambiguous, noting that the policy "explains what that phrase means: 'The policy does not participate in our surplus earnings.'" *Id.* at 221. Although the contract's cover page provides that the policy is nonparticipating *and* is not eligible for dividends, the court found use of the conjunctive "and" to be merely "a belt-and-suspenders drafting choice." *Id.* The court also rejected that "surplus earnings" could encompass positive and negative values, finding that neither case Advance Trust cited for that proposition considered the terms "nonparticipating" or "surplus earnings." *Id.* at 222. Finally, the court rejected Advance Trust's reliance on extrinsic evidence—the Board Memo and deposition testimony. The Board Memo "contains no analysis of the actual language of the policies" and does not explain why Security Life "would understand the non-participation clauses to vary from their ordinary meaning." *Id.* at 223. The deposition testimony was similarly unconvincing, as Security Life's representative defined a participating policy as "one that is—commonly offers dividends." *Id.* at 224. Overall, the court held that "this is a case where Advance Trust's reading of the contract finds no support in its language and is thus unreasonable." *Id.*

8

c. *Uniformity requirement*

The district court denied summary judgment on Advance Trust's claim that the COI rate increase violated the cost of insurance provision's uniformity requirement as applied to SAUL policies. *Id.* at 224-27. It then preliminarily certified a class consisting of SAUL policyholders subject to the COI rate increase. *Id.* at 234.

3. **Partial Settlement and Appeal**

After the summary judgment ruling, Advance Trust transferred ownership of its SAUL and LDGUL policies to PHT, and PHT became the plaintiff under Federal Rules of Civil Procedure 23 and 25(c).

The parties settled the uniformity claim involving the SAUL policies, and the district court entered final judgment. The settlement agreement preserved PHT's right to appeal the grant of summary judgment applicable to the LDGUL policies. PHT appealed the summary judgment ruling on the nonparticipating provisions but did not appeal the ruling on the cost of insurance provision. Aplt. Br. at 15 n.3.

## II. DISCUSSION

### A. *Standard of Review*

"We review contract disputes and grants of summary judgment to a defendant de novo." *Monarch Casino & Resort, Inc. v. Affiliated FM Ins. Co.*, 85 F.4th 1034, 1038 (10th Cir. 2023); *see Johnson v. Heath*, 56 F.4th 851, 863 (10th Cir. 2022) (contract interpretation); *Wilkins v. City of Tulsa*, 33 F.4th 1265, 1271-72 (10th Cir. 2023) (summary judgment grant). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

9

judgment as a matter of law." Fed. R. Civ. P. 56(a). We conduct our review "from the perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1138 (10th Cir. 2016) (quotations omitted); *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

Although a district court's contract interpretation is typically a question of law that we review de novo, *Johnson*, 56 F.4th at 863, PHT does not challenge the district court's interpretation of the cost of insurance provision, *see* Aplt. Br. at 15 n.3. We thus accept the district court's interpretation and its conclusion that Security Life complied with the terms of that provision when it raised COI rates on LDGUL policies in 2015. *See, e.g.*, *Folks v. State Farm Mut. Auto Ins. Co.*, 784 F.3d 730, 737 (10th Cir. 2015); *Owners Ins. Co. v. Dockstader*, 861 F. App'x 210, 213 n.4 (10th Cir. 2021) (unpublished) (cited for persuasive value under Fed. R. App. P. 32.1; 10th Cir. R. 32.1).

## B.  *Legal Background*

The policies were issued in Arizona, New Jersey, and Wisconsin. The district court applied the laws of those states per agreement of the parties.

Under the law of all three states, courts seek to discern "the true intentions of the parties as expressed by the contractual language." *Town Bank v. City Real Estate Dev., LLC*, 793 N.W.2d 476, 356 (Wis. 2010); *see Terrell v. Torres*, 456 P.3d 13, 15-16 (Ariz. 2020); *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1264 (N.J. 2001). Courts generally give words their plain and ordinary meaning, *see First Am. Title Ins.*

*Co. v. Johnson Bank*, 372 P.3d 292, 294 (Ariz. 2016); *Gibson v. Callaghan*, 730 A.2d 1278, 1282 (N.J. 1999); *State Farm Mut. Auto Ins. Co. v. Langridge*, 683 N.W.2d 75, 81 (Wis. 2004), and consider the reasonable expectations of the insured, *see Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 682 P.2d 388, 396-97 (Ariz. 1984); *Zacarias*, 775 A.2d at 1264-65; *Langridge*, 683 N.W.2d at 81.

All three states also require courts to interpret the provisions of a contract "not in isolation," *Town of Kearny v. Disc. City of Old Bridge, Inc.*, 16 A.3d 300, 316 (N.J. 2011), but "with reference to the contract as a whole," *Rosploch v. Alumatic Corp. of Am.*, 251 N.W. 2d 838, 841 (Wis. 1977).  A provision that seems ambiguous "if taken by itself" often becomes clear when read in light of "the whole contract." *Terrell*, 456 P.3d at 16 (quoting *Climate Control, Inc. v. Hill*, 342 P.2d 854, 859 (1959)).

In construing the contract as a whole, specific provisions ordinarily delimit the meaning of general provisions.  *See Marshall v. Patzman*, 306 P.2d 287, 289 (Ariz. 1957); *Bauman v. Royal Indem. Co.*, 174 A.2d 585, 590 (N.J. 1961); *Thomsen-Abbott Constr. Co. v. City of Wausau*, 100 N.W.2d 921, 234 (Wis. 1960); *see also Cogswell v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 78 F.3d 474, 480 (10th Cir. 1996) (noting that "it is well established under the generally applicable rules governing contract interpretation that specific provisions . . . take precedence over more general provisions").

The states differ on the treatment of extrinsic evidence.  In New Jersey and Wisconsin, a court may not consider extrinsic evidence unless the text of a contract is

11

ambiguous. *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008); *Town Bank*, 793 N.W.2d at 484. A contract is ambiguous if it is subject to more than one reasonable interpretation. *Chubb Custom Ins.*, 948 A.2d at 1289; *Town Bank*, 793 N.W.2d at 484.

In Arizona, "there is no need to make a preliminary finding of ambiguity before the *judge considers* extrinsic evidence." *Taylor v. State Farm Mut. Auto Ins. Co.*, 854 P.2d 1134, 1139 (Ariz. 1993). Instead, the judge "first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Id.* at 1140. But the court "need not waste much time if the asserted interpretation is unreasonable or the offered evidence is not persuasive." *Id.* at 1141. "A proffered interpretation that is highly improbable . . . necessarily require[s] very convincing evidence," and the court may not admit extrinsic evidence "that would vary or contradict the meaning of the written words." *Id.* at 1139, 1141.

## C. *Analysis*

PHT contends Security Life breached the insurance contract because it "recouped past losses" by increasing the COI rates to account for liability it assumed through the cancellation of its reinsurance.[3] Aplt. Br. at 12. PHT does not argue that

---

[3] PHT also contends that Security Life breached the nonparticipating provisions by calculating the new COI rates using earnings data from before the effective date of the increase. Aplt. Br. at 12. As Security Life points out, Aplee. Br. at 48, PHT did not mention this theory of breach in its opposition to summary judgment. PHT responds by

the district court erred in finding no breach of the cost of insurance provision, the only provision that expressly addresses Security Life's discretion to recalculate COI rates. Rather, PHT argues only that Security Life breached the nonparticipating provisions, which do not reference cost of insurance.

For the following reasons, we hold the nonparticipating provisions do not affect Security Life's "substantial discretion," App., Vol. I at 220, to set COI rates under the cost of insurance provision.[4]

## 1. Cost of Insurance Provision

PHT's failure to challenge the district court's interpretation of the cost of insurance provision is fatal or near-fatal to its appeal. As noted above, the court held that the cost of insurance provision gives Security Life "substantial discretion" to set COI rates so long as the company considers certain mortality factors, increases rates uniformly across premium classes, keeps rates below the guaranteed maximums, and acts with a purpose related to the provision of insurance. App., Vol. I at 216, 219-20. Because the cost of insurance provision is the only language in the contract that

---

citing to an expert report that discusses the theory, Aplt. Reply Br. at 19 n.5, but "a party cannot expect the district court to comb the record and make the party's case for it." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008). We ordinarily "limit[] our review to the materials adequately brought to the attention of the district court by the parties." *Adler*, 144 F.3d at 671. In any event, this theory of breach only reinforces our conclusion that the parties intended the cost of insurance provision, not the nonparticipating provisions, to govern COI rate changes.

[4] This holding matches the scope of this appeal and is narrower than saying that the policies "unambiguously allow Security Life of Denver to require PHT Holding to participate in Security Life's losses." Dissent at 1.

addresses Security Life's authority to set COI rates, and because we must accept the district court's conclusion that Security Life complied with that provision, it follows that Security Life did not breach the contract.[5]  PHT's attempts to escape this conclusion based on alleged breach of the nonparticipating provisions are unavailing.

2.  **Nonparticipating Provisions**

The nonparticipating provisions on their face and in the context of the whole policy plainly and only provide that a policyholder does not receive dividends.  The provisions are separate and distinct from the cost of insurance provision and have no bearing on whether Security Life may adjust the COI rate based on liabilities resulting from cancellation of reinsurance.

a.  *Text*

The nonparticipating provisions say the policy is "nonparticipating," meaning "[t]he policy does not participate in our surplus earnings," App., Vol. I at 113, and "is not eligible for dividends," *id.* at 88.  They say nothing about COI rates.

As the district court explained, "surplus is 'an amount in excess' or 'what remains over and above what has been taken or used'"; and "'earnings' means 'recompense, reward, esp. for service; gain, profit.'"  App., Vol. I. at 220 (quoting *Oxford English Dictionary* (3d ed. 2009)); *see Earnings*, *Black's Law Dictionary*

---

[5] "Complied" accurately describes the district court's holding.  The court analyzed the cost of insurance provision's limits on "Security Life's rate-setting discretion" and concluded that "the alleged actions here" fell within that discretion.  App., Vol. I at 219; *see also id.* at 218 (stating the issue was "whether Security Life had the authority to raise cost-of-insurance charges, and if so, what bounds the contracts put on that authority").

(12th ed. 2024) (defining "surplus earnings" as "[t]he excess of corporate assets over liabilities within a given period, usu. a year"). Based on these definitions, "surplus earnings" means income above costs and other expenses. And a "dividend" is "[a] share of profits paid to a stockholder or to a policyholder in a mutual insurance society," or "[a] share of a surplus; a bonus." *The American Heritage Dictionary of English Language* 527 (5th ed. 2011); *see Dividend*, *Black's Law Dictionary* (12th ed. 2024) ("A portion of a company's earnings or profits distributed pro rata to its shareholders, usu. in the form of cash or additional shares.").

According to PHT, the ordinary meaning of "participate in" is "to take part in something . . . to have a part or share in something." Aplt. Br. 29 (quoting *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 891 (11th Cir. 2023)). Under that understanding, the nonparticipating provisions provide only that policyholders do not "share in" the company's "surplus earnings" through receipt of a dividend. *See Nonparticipating*, *Black's Law Dictionary* (12th ed. 2024) ("Not taking part in something; specif., not sharing or having the right to share in profits or surpluses.").[6] The text does not relate to the cost of insurance.[7]

---

[6] The word "nonparticipating" does not stand alone. The policy states that it "is nonparticipating and is not eligible for dividends" and "does not participate in our surplus earnings," which plainly means that the policyholder does not share in Security Life's profits through receipt of a dividend. We agree with the district court that the cover page uses "and" to emphasize that nonparticipating means no dividends. The phrase "does not participate in our surplus earnings" confirms this reading.

[7] As the foregoing plainly shows, PHT's contention that "surplus earnings" may have a negative value lacks merit. *See also Webster's Third New International Dictionary* 714, 2301 (1976 ed.) (defining (1) "surplus" as "an excess of receipts over

b. *Context*

Reading the nonparticipating provisions in the context of the whole contract confirms they do not concern COI rates.

First, the cost of insurance provision does not discuss nonparticipation, and the nonparticipating provisions do not discuss the cost of insurance (or any other monthly deduction).

Second, the cost of insurance provision appears in the deductions section of the contract, and the nonparticipating provisions appear in a list of general policy provisions elsewhere in the contract. They do not cross-reference each other or provide any indication they are related.

Third, the only language in the contract that addresses the setting of the COI rate is the cost of insurance provision. Under the principle that specific contract provisions control over general ones, the cost of insurance provision controls here. Indeed, this principle applies with greater force here because courts typically use it to favor the specific over the general when both concern the same matter. The Security

---

disbursements" as "opposed to *deficit*"; (2) "earnings" as "the balance of revenue for a specific period that remains after deducting related costs and expenses incurred"; and (3) "earned surplus" as "the net accumulated balance of earnings of a corporation that remains after deducting losses, distributions to stockholders, and transfers to capital stock accounts and that includes appropriated surplus (as reserve for contingencies) as well as unappropriated surplus").

Life cost of insurance provision concerns cost of insurance; the nonparticipating provisions do not.[8]

Fourth, when considered in context, PHT's argument that Security Life somehow promised in the nonparticipation provisions not to raise COI rates based on losses from the cancellation of its reinsurance fares poorly. The cost of insurance provision expressly gives Security Life the authority to raise COI rates "from time to time." App., Vol. I at 107. In setting rates, the company must consider certain mortality factors, raise rates uniformly across premium classes, keep rates below established maximums, and act with a purpose related to the provision of insurance. *Id.* at 216, 219. Reading the nonparticipating provisions "with reference to the contract as a whole," *Rosploch*, 251 N.W. 2d at 841, we see no reason to infer that the nonparticipating provisions contain a hidden, additional limit on Security Life's discretion to set COI rates.[9]

---

[8] The dissent finds "no conflict between the COI provisions and the nonparticipation provisions." Dissent at 8. We agree in that the nonparticipating provisions do not concern Security Life's discretion to set COI rates. We mention the specific/general canon only to reinforce that the COI provision addresses the COI rate and the nonparticipating provisions do not.

[9] The dissent argues "there is nothing in the Policies that informs policyholders they may be liable for losses incurred by the insurer." Dissent at 2. But the cost of insurance provision informs policyholders that Security Life may raise COI rates "from time to time" if it does so uniformly across premium classes, "refer[s] to" certain mortality factors, and keeps rates below listed maximums. App., Vol. I at 216.

As noted above, PHT appeals only the district court's holding that Security Life did not breach the nonparticipating provisions. It has waived its theory that Security Life breached the cost of insurance provision. Aplt. Br. at 15 n.3. PHT makes no attempt to reconcile its interpretation of the nonparticipating provisions with the district court's interpretation of the cost of insurance provision.

c.  *Participating and nonparticipating policies*

Our analysis of the plain text and context of the policies suffices to resolve this appeal.  But the generally accepted understanding of participating and nonparticipating insurance confirms that the nonparticipating provisions do not concern cost of insurance.

Participating insurance is "life insurance that pays dividends."  John Downes & Jordan Elliot Goodman, *Dictionary of Finance and Investment Terms* 535 (9th ed. 2014).  A dividend "represents a share of the *surplus earnings* apportioned . . . for distribution to its policyholders."  5 *Couch on Insurance* § 80.50 (emphasis added).  Participating policies "participate in" an insurer's surplus earnings by "having their dividends rise and fall."  Downes & Goodman at 535; 5 *Couch on Insurance* § 80.50.

Nonparticipating insurance is "life insurance . . . that does not pay dividends"—"[t]he opposite of a participating policy."  Downes & Goodman at 497, 535.  Nonparticipating policyholders "thus do not participate in the interest, dividends, and capital gains earned by the insurer on premiums paid."  *Id.* at 497; *see* 1 *New Appleman on Insurance Law Library Edition* § 1.08 ("A participating policy is one in which dividends based upon company earnings are paid by the company to the policyholder. . . . A nonparticipating policy is one on which no dividends are paid.").

The key distinction between participating and nonparticipating policies is the receipt or non-receipt of dividends.  An insurer's profits or losses may affect

18

dividends and how much of them are paid to a participating policyholder.  An insurer's profits or losses do not affect whether dividends are paid to a nonparticipating policyholder because, by definition, the holder does not receive dividends.  Whether an insurer's losses may affect a policyholder's cost of insurance does not depend on whether the policy is participating or nonparticipating.  The answer to that question turns on the discretion the policy gives to the insurer to set the COI rate.  And here, the district court determined that the cost of insurance provision allows Security Life to consider losses.[10]

d.  *Extrinsic evidence*

PHT's reliance on the Board Memo and deposition testimony is unavailing.  Because the nonparticipating provisions clearly do not affect the cost of insurance provision, we do not consider this extrinsic evidence under New Jersey and Wisconsin law.  *See Town Bank*, 793 N.W.2d at 484; *Chubb Custom Ins.*, 948 A.2d at 1289.  Under Arizona law, we find that the contract is not "reasonably susceptible" to PHT's interpretation in light of the extrinsic evidence.  *Taylor*, 854 P.2d at 1140.

PHT contends that the COI rate increase breached the nonparticipating provisions even though, under the district court's ruling, it did not breach the cost of

---

[10] PHT relies on a New Jersey regulation that prohibits insurers from modifying COI rates in a way that "result[s] in the distribution of prior profits or the recovery of prior losses."  N.J. Admin. Code § 11:4-47.4(b).  It applies to both participating and nonparticipating policies.  *Id.* § 11:4-47.1-.2.  Even if it may be relevant to how the cost of insurance provision should be interpreted, PHT does not challenge the district court's interpretation of that provision.

insurance provision. As we have just explained, the nonparticipating provisions say nothing about COI rates. PHT's interpretation of the contract is thus "highly improbable" and requires "very convincing evidence" of the parties' intent. *Id.* at 1141. The evidence Security Life cites is not persuasive. *See id.*

The Board Memo says the nonparticipating provisions mean the company "may not attempt to recoup past losses from the policyholder." App., Vol. II at 489. But nothing in the memo indicates that Security Life understood the nonparticipating provisions to prohibit what the cost of insurance provision permits. To the contrary, it identifies the cost of insurance provision as controlling "what factors may be considered in evaluating any adjustment" and explains that the company "considered *only* those factors" permitted by the cost of insurance provision in determining the new COI rates. *Id.*

A similar point applies to the deposition testimony. PHT notes that a Security Life executive answered "no" when asked whether the company could use a COI rate increase to "recoup past losses." Aplt. Br. 42. Another executive said that "as a stock company . . . we don't recover past losses." *Id.* Neither answer refers to the nonparticipating provisions, so the testimony does not support PHT's contention that the nonparticipating provisions establish limits on Security Life's discretion to set COI rates under the cost of insurance provision.[11]

---

[11] PHT notes its expert opined that changes to COI rates on nonparticipating universal life products should be prospective only and that policyholders "do not get the upside of past profits, nor do they have to reimburse the insurer for past losses." App., Vol. II at 383. This extrinsic evidence is untethered to an interpretation of Security Life's

PHT's "proffered interpretation" is "highly improbable" and runs counter to "the written words" of the nonparticipation provisions. *Taylor*, 854 P.2d at 1139, 1141. Considering the nonparticipating provisions and the cost of insurance provisions together, we conclude that under Arizona law the extrinsic evidence does not render the contract "reasonably susceptible" to PHT's interpretation. *Id.* at 1140.

* * * *

Security Life complied with the cost of insurance provision when it recalculated COI rates. The nonparticipating provisions plainly concern only dividends paid from surplus earnings, consistent with the generally accepted understanding of participating and nonparticipating insurance. A reasonable policyholder would not understand those provisions to override Security Life's discretion to set COI rates under the cost of insurance provision.

## III. CONCLUSION

We affirm the district court's judgment.

---

policy provisions. It is especially "not persuasive," *Taylor*, 854 P.2d at 1141, when considered in light of the district court's unchallenged conclusion that the parties to this contract agreed to give Security Life "substantial discretion" to raise COI rates under the cost of insurance provision, including through consideration of profit and loss. App., Vol. I at 213, 219-20. The expert opinions thus do not create a genuine dispute of material fact.

No. 23-1326, *PHT Holding I v. Security Life of Denver Insurance Company*

**McHUGH,** Circuit Judge, dissenting:

The majority holds that three "nonparticipating" life insurance policies (the "Policies") unambiguously allow Security Life of Denver to require PHT Holding to participate in Security Life's losses. In my view, however, the Policies neither define the term "nonparticipating" nor address whether the cost of insurance ("COI") can be increased to recoup Security Life's losses. Indeed, the Policies are silent as to whether policyholders must subsidize Security Life's losses. Because the Policies lack the clarity necessary to impose such an obligation on the policyholders, I respectfully dissent.

At the outset, I disagree with the majority's characterization of the district court's ruling on the COI provision. The majority asserts the district court "conclu[ded] that Security Life complied with the [the COI] provision when it raised COI rates." Maj. Op. at 10; *see also id.* at 14 & n.5, 21. But I read the district court's decision differently. Rather than finding that Security Life *complied* with the COI provisions, the district court held that Security Life did not *violate* the COI provisions when it referred to factors other than the listed mortality factors. In my view, this is not a distinction without a difference. Concluding that Security Life did not violate the Policies by referring to non-enumerated factors while setting the COI rate leaves unanswered the question of whether Security Life violated the Policies in *another* way; namely, by requiring PHT to participate in Security Life's losses via the COI rate calculation.[1]

---

[1] The majority disagrees with my view of the district court's opinion, noting that the court stated the issue before it was "whether Security Life had the authority to raise

Turning to the analysis of PHT's separate theory of breach based on the nonparticipation clauses, each Policy identically states on its first page: "This [P]olicy is nonparticipating and is not eligible for dividends." App. Vol. I at 88, 127, 167. Then in a section entitled "General Policy Provisions," under the heading "Nonparticipating," the Policies state that policyholders "do[] not participate in [Security Life's] surplus earnings." *Id.* at 113, 152, 192. Beyond those instances, the term "nonparticipating" appears nowhere in the Policies, including in the "Definitions" sections. *See id.* at 99–100, 138–39, 178–79.

I would conclude that the Policies' statements that they are "nonparticipating" and that policyholders do not participate in surplus earnings do not unambiguously inform an insured that the Policies are nonparticipating *only* as to Security Life's surplus earnings. As discussed below, there is nothing in the Policies that informs policyholders they may be liable for losses incurred by the insurer. The extrinsic evidence submitted by PHT supports this reading, showing that nonparticipation can be reasonably interpreted as

---

cost-of-insurance charges, and if so, what bounds the contracts put on that authority." Maj. Op. at 14 n.5. But as relevant here, PHT presented *two* theories as to what "bounds" the Policies placed on Security Life's authority to increase the COI charges: (1) that Security Life could not refer to factors other than the mortality factors when raising the COI rate, and (2) that the nonparticipation provisions prevented Security Life from increasing COI charges based on past losses. *See* App. Vol. I at 220. Although the majority rightly notes that PHT did not appeal the district court's rejection of the first theory of breach, it did appeal the district court's rejection of the second theory. In my view, the district court's holding that the list of factors to be considered in setting the COI rate was not exclusive does not equate to holding that the COI provisions allow Security Life to consider past losses when setting the COI rates, notwithstanding the nonparticipation provisions. And unlike the majority, I would not hold this argument is waived. *See* Maj. Op. at 17 n.9.

extending both to Security Life's surplus earnings and its losses. Accordingly, I would hold that the meaning of "nonparticipating" is ambiguous, and the district court therefore erred by granting summary judgment in favor of Security Life.

## I.   ANALYSIS

### A.   *The Policies*

The Policies use the term "nonparticipating" only twice. First, each Policy states on its cover page: "This [P]olicy is nonparticipating and is not eligible for dividends." *Id.* at 88, 127, 167. Nothing in this sentence purports to define "nonparticipating." And the sentence's second clause does not facially limit the first clause. Rather, the fact that the clauses are joined by "and," rather than by a limiting connecter such as "in that" or "to the extent," indicates that the second clause supplements, rather than limits, the first clause. *See Pulsifer v. United States*, 601 U.S. 124, 161 (2024) (Gorsuch, J., dissenting) (explaining that "and" is an additive conjunction that typically means "along with," "in addition to," or "as well as" (citations omitted)). Put simply, nothing in this prefatory sentence indicates that these nonparticipating Policies require policyholders to participate in Security Life's losses.[2]

---

[2] The district court concluded this sentence was "more properly understood as an additional effort at defining 'nonparticipating' and something of a belt-and-suspenders drafting choice." App. Vol. I at 221. But as PHT points out, it is equally possible that this belt-and-suspenders approach was intended to emphasize the aspect of the nonparticipation provisions that Security Life found most important, rather than to clumsily set forth an exhaustive definition of "nonparticipating." Either reading is reasonable, making this sentence ambiguous regarding the question of losses.

Second, the Policies include a provision entitled "Nonparticipating" in their "General Policy Provisions" sections. App. Vol. I at 113, 152, 192. These provisions comprise a single sentence, which states: "The [P]olicy does not participate in [Security Life's] surplus earnings." *Id.* Again, these provisions do not purport to define "nonparticipating." Nor do they explicitly limit the meaning of "nonparticipating" to a policyholder's inability to collect surplus earnings. Importantly, nothing in these provisions addresses whether the Policies are also nonparticipating as to Security Life's losses. Instead, the Policies are silent as to whether Security Life may require PHT to participate in its losses. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 93 (2012) ("The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it.").

Because the Policies do not define "nonparticipating," we next look to common dictionary definitions for a commonly understood meaning that a lay insured would understand. *See Cypress Point Condo. Ass'n v. Adria Towers, L.L.C.*, 143 A.3d 273, 286 (N.J. 2016); *Weimer v. Country Mut. Ins.*, 575 N.W.2d 466, 473 (Wis. 1998); *Teufel v. Am. Fam. Mut. Ins.*, 419 P.3d 546, 548 (Ariz. 2018). Merriam-Webster defines "nonparticipating" as "not taking part in something" or "not participating." *Nonparticipating*, Merriam-Webster, https://www.merriam-webster.com/dictionary/nonparticipating (last visited Oct. 31, 2024). It further defines "participate" as "to take part" and "to have a part or share in something." *Participate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/participate (last visited Oct. 31, 2024). The Oxford English Dictionary similarly defines "nonparticipating" as "does not participate;

4

not taking part," noting that this definition has been in use since 1876. *Non-Participating*, Oxford English Dictionary (July 2023). These dictionary definitions reveal that the commonly understood meaning of "nonparticipating" is broad—the term is indicative of not taking part in something. The term itself leaves unanswered the question of *what* the Policies do not take part in: only Security Life's surplus earnings, or its losses as well?

By contrast, the majority relies on technical, industry-specific definitions that set forth a "generally accepted understanding" of participating and nonparticipating insurance. Maj. Op. at 18–19. Of course, these are not the *only* industry definitions of nonparticipation clauses—as discussed in more detail below, PHT relies on other technical definitions that favor its position. But either way, industry definitions do not establish how a layperson who is "not trained in law or in the insurance business" would reasonably understand the term "nonparticipating," which is the inquiry required under Arizona, Wisconsin, and New Jersey law. *Sparks v. Republic Nat'l Life Ins.*, 647 P.2d 1127, 1132 (Ariz. 1982); *see also Day v. Allstate Indem. Co.*, 798 N.W.2d 199, 206 (Wis. 2011) ("We give undefined words and phrases their common and ordinary meaning."); *Zacarias v. Allstate Ins.*, 775 A.2d 1262, 1265 (N.J. 2001) (affirming that policyholders "should not be subjected to technical encumbrances or to hidden pitfalls" (quoting *Kievet v. Loyal Protective Life Ins.*, 170 A.2d 22, 26 (N.J. 1961))). The insurance industry's "generally accepted understanding" of nonparticipation clauses, quite simply, does not illuminate the *common and ordinary* meaning of "nonparticipating."

The ambiguity of "nonparticipating" as used in the Policies is underscored by surrounding provisions that tend to either explicitly define policy terms or provide partial

5

definitions that plainly provide some, but not all, of a particular term's meaning. Most notably, the Policies include identical "Definitions" sections that do not define "nonparticipating" or address whether Security Life can require policyholders to participate in its losses. And while the Policies define terms outside of the Definitions sections, when they do so, they typically employ language that explicitly defines such terms or conditions. For example, under the heading "Surrender Value," the Policies state, "The net cash surrender value on any date *will be* your account value minus any applicable surrender charge and minus any policy loan including accrued but unpaid loan interest." App. Vol. I at 109, 148, 188 (emphasis added). And the Policies provide that "[a] segment *is* a block of death benefit coverage." *Id.* at 92, 131 171 (emphasis added). In another instance on the cover page—just above the sentence stating that the Policies are "nonparticipating and [are] not eligible for dividends"—each Policy defines the words "you" and "your" as "refer[ring] to the owner of the [P]olicy." *Id.* at 88, 127, 167. In short, both within and outside the Definitions section, the Policies consistently use clear, explicit language when defining a term.

At the same time, the Policies sometimes set forth *non-exhaustive* definitions that either implicitly or by their own terms do not comprise a complete definition. For example, in their COI provisions the Policies state that, for purposes of setting the COI rate, "[t]he Company will refer to the gender and age of the insured as of the effective date of segment coverage, the duration since the coverage began, the amount of target death benefit and the segment premium class in applying its current rates for each insured." *Id.* at 107. As the district court found and as the policyholders do not challenge,

6

this list of factors does not limit Security Life from considering "other factors" when adjusting the COI because the inclusion of "a list of factors one must consider is a far cry from forbidding consideration of anything else." *Id.* at 217. Another example appears in the "Ownership" provisions, where the Policies state, "You, as the owner, can exercise all rights and receive the benefits until the insured's death," which "*includes* the right to change the owner, beneficiaries, and methods for the payment of proceeds." *Id.* at 112 (emphasis added). This list of rights by its own terms does not comprise an exhaustive list of the rights to which an owner is entitled; indeed, the Policies elsewhere set forth additional rights and options for policyholders. *See, e.g.*, *id.* at 100–02, 108. Yet another example is the "Incontestability" provision, where the Policies explain that Security Life "will not contest the statements in the [insured's] application" after certain periods of time have elapsed. *Id.* at 112. This statement is qualified in the next section, however, where the Policies provide that, "[n]otwithstanding the incontestability provision above," Security Life *will* contest a benefit claim if the insured's age or gender was misstated in the application. *Id.*

In my view, the nonparticipation provisions could be reasonably construed as falling into this category of non-exhaustive definitions. Critically, the Policies' discussion of nonparticipation is minimal—they state only that (1) the Policies are nonparticipating and (2) policyholders do not participate in dividends or surplus earnings. They are silent as to the question of participation in losses, and never purport to exhaustively define the ways in which the Policies are nonparticipating. Because the Policies discuss other terms

7

in a non-exhaustive manner, it is reasonable to read the nonparticipation provisions the same way—as not setting forth an exhaustive definition of "nonparticipating."

Despite the Policies' silence regarding whether policyholders must participate in losses, the majority concludes there is "no reason to infer that the nonparticipating provisions contain a hidden, additional limit on Security Life's discretion to set COI rates," Maj. Op. at 17, and applies the general/specific canon to find that the COI provisions somehow supersede the nonparticipation provisions, *id.* at 16–17. But the general/specific canon applies only when "'there is a conflict between a general provision and a specific provision,' in which case the 'the specific provision prevails.'" *State v. Santillanes*, 541 P.3d 1150, 1156 (Ariz. 2024) (quoting Scalia & Garner, *Reading Law* 183 (2012)). Here, there is no conflict between the COI provisions and the nonparticipation provisions—as the majority acknowledges, the provisions "do not cross-reference each other or provide any indication they are related." Maj. Op. at 16. Because the Policies are silent as to whether policyholders must participate in Security Life's losses, I respectfully depart from the majority's conclusion that these provisions conflict.

In sum, I would conclude that the meaning of "nonparticipating" is ambiguous in light of the relevant text, the broad commonly understood definition of the term, and the broader context of the Policies, which consistently specify when and if a definition is exhaustive. As I read the Policies, they simply do not address the question of participation in losses and are facially "susceptible to more than one reasonable interpretation." *Danbeck v. Am. Fam. Mut. Ins.*, 629 N.W.2d 150, 154 (Wis. 2001); *see also Chubb Custom Ins. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008);

8

*Roberts v. State Farm Fire & Cas. Co.*, 705 P.2d 1335, 1337 (Ariz. 1985). Therefore, I would hold that the district court erred by granting summary judgment on this issue.

### B.     Extrinsic Evidence

Under Arizona law, we must also consider whether any extrinsic evidence renders the term "nonparticipating" less or more ambiguous. *Taylor v. State Farm Mut. Auto. Ins.*, 854 P.2d 1134, 1140 (Ariz. 1993). Pursuant to this rule, a court "first considers the offered evidence," and if it concludes that "the contract language is 'reasonably susceptible' to the interpretation asserted by [the proponent of the evidence], the evidence is admissible to determine the meaning intended by the parties." *Id.* (quoting Restatement (Second) of Contracts § 215 cmt. b (Am. L. Inst. 1979)). Under my analysis, this evidence is also pertinent to the New Jersey and Wisconsin Policies, because New Jersey and Wisconsin law permit courts to consider extrinsic evidence when the meaning of an insurance provision is textually ambiguous. *Chubb Custom*, 948 A.2d at 1289; *Seitzinger v. Cmty. Health Network*, 676 N.W.2d 426, 433 (Wis. 2004).

PHT argues that several pieces of extrinsic evidence support its interpretation of "nonparticipating": (1) the 2015 Board Memorandum (the "Memo") that prospectively reviewed the COI rate increase at issue; (2) testimony by witnesses for both parties; (3) a New Jersey banking regulation; and (4) technical, industry definitions. This extrinsic evidence underscores that both parties' interpretations are reasonable and, consequently, the Policies are ambiguous.

9

1.     **The Memo**

PHT argues the Memo demonstrates that the nonparticipation provisions were intended to prohibit participation both in surplus earnings and recouped losses. The Memo, which was drafted by two Security Life actuaries, reviewed "proposed adjustments" to non-guaranteed elements (e.g., the COI rate) for many "in-force universal life insurance policies" issued by Security Life, including the Policies at issue here. App. Vol. II at 488—SEALED. The Memo states that its authors were "mindful" of the nonparticipation provisions and understood them to prevent policyholders from sharing in Security Life's profits *and* Security Life from attempting "to recoup past losses" by increasing the COI rate. *Id.* at 489. Viewing the Memo in the light most favorable to PHT as we must on summary judgment, this statement—made by Security Life's actuaries—supports PHT's interpretation of the nonparticipation provisions.

The majority attempts to discount the Memo, stating that "nothing in the [M]emo indicates that Security Life understood the nonparticipating provisions to prohibit what the [COI] provision permits." Maj. Op. at 20. But the Memo states that the working group was "mindful" of the nonparticipation provisions while determining whether to adjust the COI rate and that the provisions prohibit Security Life from "attempt[ing] to recoup past losses from the policyholder." *See* App. Vol. II at 489—SEALED. Unlike the majority, I would conclude the COI provisions do not "permit" Security Life to factor in its losses when redetermining the COI rate—rather, the Policies are silent on this point. And the Memo helps to fill this silence by illustrating that Security Life's own actuaries

10

understood the nonparticipation provisions to prohibit increasing the COI rate "to recoup past losses from the policyholder." *See id.*

The district court similarly dismissed the Memo, finding that it "contains no analysis of the actual language of the [P]olicies or why Security Life (as opposed to the drafters of the memorandum) would understand the non-participation clauses to vary from their ordinary meaning." App. Vol. I at 223. The court ultimately ruled that the Memo's "reading of the [Policies] finds no support in [their] language and is thus unreasonable." *Id.* at 224. I am unpersuaded by the district court's analysis on this point because, as discussed above, (1) the ordinary meaning of "nonparticipating" is broad and could support either party's interpretation, and (2) the plain language of the Policies does not discuss whether policyholders must participate in Security Life's losses.

For its part, Security Life argues that the Memo merely contains "actuaries' remarks about what the 'non-participating' provisions require" and is but "a summary statement that applies generally to more than two dozen different policies" that were under review. Appellee's Br. at 37. Security Life does not dispute, however, that the Policies were within the Memo's scope of review. Further, that review was extensive. The Memo states that thousands of hours of work were involved and that the review was conducted by Security Life's actuarial staff, led by a steering committee that met regularly for two years, and relied on advice from outside legal counsel and independent actuarial experts.

Security Life asks the court to infer that Security Life's intensive review of a COI rate increase for its life insurance policies, including the Policies, provides no insight into

11

how Security Life understood the instant Policies' nonparticipation provisions. I would

reject such an inference as unfavorable to PHT, the nonmovant at summary judgment.

*See Tufaro v. Okla. ex rel. Bd. of Regents of Univ. of Okla.*, 107 F.4th 1121, 1131 (10th

Cir. 2024). In my view, the Memo supports PHT's interpretation of "nonparticipating."

**2.     Testimony**

Both parties argue that various testimony supports their positions, but none of this

testimony is material to the textual analysis above, other than to further drive home that

either party's definition of "nonparticipating" is reasonable. The testimony can be

broadly grouped into two categories.

First, testimony from several witnesses discusses Security Life's broader body of

insurance policies but *not* the specific Policies at issue here. For instance, PHT relies on

testimony by Scott Carney, one of the Memo's authors, in which Mr. Carney answered

"No" when asked if Security Life could recoup its past losses using a COI rate increase.

But Mr. Carney later qualified his testimony by stating "you would have to read each

specific policy" to know if it allowed Security Life to raise COI based on past losses.

Supp. App. at 48. PHT also points to testimony by Joseph Fick, a Security Life actuary,

who stated that Security Life does not raise the COI rate to recover for past losses.

However, Mr. Fick was discussing Security Life's insurance policies generally, not these

specific Policies. Similar to the majority, I view this testimony as providing minimal

support for either party's interpretation of "nonparticipating" because it does not consider

the specific Policies at issue here.

Second, both parties rely on conflicting expert testimony, which again underscores that either interpretation is reasonable. PHT relies on an expert report from Howard Zail, where he opines that the Memo's interpretation of "nonparticipating" is "accurate and consistent with well-established actuarial principles [in that] . . . policyowners do not get the upside of past profits, nor do they have to reimburse the insurer for past losses."[3] App. Vol. II at 383—SEALED. On the other hand, Security Life relies on its own expert, Timothy Pfeifer, who disagreed with Mr. Zail's report. Security Life also relies on testimony from another of the Memo's authors and its corporate representative, Tony Brantzeg, who stated that Security Life's redetermination policy, rather than the Policies, was what prevented Security Life from raising the COI to recoup past losses. The majority does not acknowledge this conflicting expert testimony regarding the relevant nonparticipation provisions. However, I view this conflicting testimony as illustrating that either party's interpretation of the nonparticipation provisions is reasonable.

### 3.   New Jersey Law and Technical Sources

PHT next argues that a New Jersey regulation and various technical industry understandings of nonparticipating policies support its construction of the Policies. New

---

[3] Mr. Zail's report undercuts Security Life's arguments on appeal that PHT submitted no evidence of (1) losses Security Life experienced or (2) damages. The expert report opines that Security Life increased the COI to recoup past losses accruing from the cancellation of its reinsurance contracts. Mr. Zail also opines those past losses "associated with the 2011 and 2014 recaptures was a primary driver of the COI [i]ncrease," rendering the entire COI increase "improper." App. Vol. II at 415, 417—SEALED. This evidence provides a basis for finding that (1) Security Life's recapture of reinsurance contracts produced losses that Security Life factored into the COI rate increase and (2) PHT suffered damages in the amount of the total COI increase. In short, Security Life's alternative arguments are not supported by the record.

Jersey's Administrative Code, which sets rules for modifying flexible factors (such as the COI) for in-force insurance policies, states that "[a]ny modification to flexible factors shall not result in the distribution of prior profits or the recovery of prior losses." N.J. Admin. Code § 11:4-47.4(b). Security Life argues that because these regulations apply to all insurance policies, both participating and nonparticipating, they have "nothing to say one way or the other" about the Policies at issue. Appellee's Br. at 42. True, but to the extent PHT raises this point to show that Security Life is unlikely to have drafted a New Jersey insurance policy that violates New Jersey law, the point is well taken and provides some support for PHT's reading of the Policies.

PHT also cites several industry publications and technical definitions that support its position. One such publication is a 1980 panel discussion by the Society of Actuaries, in which a panelist stated the "consensus of actuaries" is that a core "philosophy behind non-participating insurance" is that if "premiums change the readjusted premiums will not include any distribution of past profit or loss." Appellant's Br. at 40; *see also Nonparticipating Life Products with Nonguaranteed Premiums*, 6 Record of Soc'y of Actuaries 669, 671 (1980).[4] Security Life disputes the relevance of technical sources such as this, without arguing against their accuracy. I agree with Security Life that technical definitions shed little light on the plain, ordinary meaning of "nonparticipating," which would be understood by a reasonable purchaser of insurance. *See Zacarias*, 775 A.2d at

---

[4] Accessible at https://www.soa.org/globalassets/assets/library/proceedings/record-of-the-society-of-actuaries/1980-89/1980/january/RSA80V6N32.PDF.

1264; *Danbeck*, 629 N.W.2d at 153; *Walker v. Auto-Owners Ins.*, 517 P.3d 617, 620 (Ariz. 2022).

PHT also asserts the district court misconstrued several key technical sources because those sources actually support PHT's position. For example, the district court relied on a source stating that in a "nonparticipating life insurance policy," the insureds "do not participate in the interest, dividends, and capital gains earned by the insurer on premiums paid." App. Vol. I at 221 (quoting John Downes & Jordan Elliot Goodman, *Dictionary of Finance and Investment Terms* 497 (9th ed. 2014)). The majority similarly relies on this technical definition. PHT notes, however, that Downes & Goodman also defines a participating life insurance policy as one where "[t]he policyholders participate in the success or failure of the company's underwriting and investment performance by having their dividends rise or fall." Appellant's Br. at 44 (quoting Downes & Goodman, *Dictionary of Finance and Investment Terms* 535). As PHT reasonably argues, this definition of a participating life policy supports an inference that *non*participating policies might not require policyholders to participate in the success or failure of the insurer.

In total, neither the New Jersey regulation nor the technical sources discussed by PHT establish that PHT's interpretation of "nonparticipating" is correct. But these authorities cast as reasonable PHT's interpretation of the nonparticipation provisions. In combination with the Memo's acknowledgement that the nonparticipation provisions prohibit Security Life from raising the COI rate based on past losses, the extrinsic evidence supports PHT's interpretation of "nonparticipating." And none of the extrinsic

15

evidence undermines PHT's interpretation. In my opinion, the Policies, both on their own

and when considered alongside the extrinsic evidence, are ambiguous as to whether the

nonparticipation provisions bar Security Life from requiring PHT to participate in

Security Life's losses. Thus, I would hold that the district court erred by finding the

nonparticipation provisions unambiguous and granting Security Life summary judgment

on this issue.

## II.    CONCLUSION

The Policies do not provide a definition of "nonparticipating," and the two places

they use the term do not unambiguously provide that definition. Thus, I would conclude

that the Policies are ambiguous. That conclusion is strengthened to the extent I consider

the extrinsic evidence. Accordingly, I would reverse the district court's order granting

summary judgment in favor of Security Life. I respectfully dissent.